UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
EQUITAS DISABILITY ADVOCATES, LLC, )
)
      **Plaintiff,**          )
)
      **v.**                 )      **Civil Action No. 14-01644 (RCL)**
)
DAVID A. BRYANT et al.,      )
)
      **Defendants.**      )
)

## MEMORANDUM OPINION

Before the Court are defendants' Motion [19] to Dismiss the plaintiff's Second Amended Complaint and plaintiff's Motion [15] for Leave to Take Jurisdictional Discovery. Upon consideration of the motions, oppositions, replies, the entire record in this case, and the applicable law, the Court will GRANT defendants' Motion [19] to Dismiss the Amended Complaint and DENY plaintiff's Motion [15] for Leave to Take Jurisdictional Discovery.

## I.    BACKGROUND

At the center of this dispute is a valuable compilation of insurance documents plaintiff refers to as the "Archive." Second Am. Compl. [12] ¶ 13, Nov. 3, 2014. The Archive was developed by Brian Abeles after he worked for decades in the insurance industry as an insurance broker, benefits consultant and claims consultant. *Id.* at ¶ 11. Abeles planned to the license the Archive's contents to disability insurance lawyers who were in the business of bringing claims against insurance companies to secure the appropriate recovery for their clients. *Id.* at ¶¶ 11, 13. Fulcrum Law Group, PLLC ("FLG"), a corporation Abeles formed and managed, ultimately entered into two agreements to license the Archive's contents to Daley, DeBofsky & Bryant P.C., ("DDB"), an Illinois-based professional corporation that dissolved in 2013. *Id.* at ¶¶ 31, 108. The

plaintiff now alleges that defendants breached those contracts and carried out an elaborate fraud to gain access to the Archive. *Id.* at ¶¶ 22, 84-98.

The plaintiff in this case is Equitas Disability Advocates, LLC, ("Equitas") a limited liability company based in Washington, D.C. and co-founded by Brian Abeles and Joshua N. Rose. *Id.* at ¶¶ 2, 10. Equitas is the successor-in-interest to FLG and the holder of the "Archive." *Id.* at ¶ 2. Abeles, then through FLG, and David Bryant of DDB began negotiations to license the Archive in the summer of 2007. *Id.* at ¶ 14. Defendants Daley, DeBofsky, and Bryant were all members of DDB, which "never practiced and was never organized as a partnership." Defs.' Mem., [19-2] Ex. A, Bryant Decl., ¶ 4. Now dissolved, David Bryant incorporated DDB as a professional corporation under Illinois law in July 2002. *Id.* at Ex. E (providing proof of DDB's incorporation).

In June 2007, Abeles met defendant Bryant and Jonathan Feigenbaum, a non-party in this litigation, at a disability litigation conference in Boston, Massachusetts, where Bryant first learned of and expressed interest in the Archive. Second Am. Compl. [12] ¶ 14. Later that month, Abeles took the first of his many trips to Chicago, where he, Bryant, the other members of DDB, and Feigenbaum discussed the possibility and potential terms of licensing portions of the Archive. *Id.* at ¶¶ 15-19. Abeles stressed that he could not discuss the details of the Archive until DDB signed a non-disclosure agreement relating primarily to the use of the Archive's confidential information, which Bryant signed on behalf of DDB in June 2007. *Id.* at ¶¶ 14-15.

The next phase of negotiations centered on how best to compensate Abeles for access to his archive in light of his status as a non-lawyer. *Id.* at ¶¶ 23-27. The parties determined that although most jurisdictions prohibited lawyers from sharing fees with non-lawyers, Washington D.C. was an exception; the District of Columbia Rules of Professional Conduct permit non-lawyers to have a financial stake in law firms so long as a number of specific conditions are satisfied. *Id.* at ¶ 24 (citing D.C. Rule of Professional Responsibility 5.4(b)). As such, the parties decided the

"solution" was to create a Washington D.C.-based law firm, "in which Mr. Abeles would have a minority interest." *Id.* at ¶ 25. Abeles's newly created law firm would then serve as co-counsel with DDB or Feigenbaum in various disability insurance cases, effectively permitting a fee sharing scheme to govern the underlying licensing agreements. *Id.* DDB supported this idea, so long as Abeles obtained an ethics opinion stating that such fee sharing was proper under applicable D.C. law. *Id.* at ¶ 31; Defs.' Mem., [19-2] Ex. A, Bryant Aff., ¶¶ 20-23.

In connection with obtaining an ethics opinion, Bryant, Abeles, and an array of lawyers met in Washington, D.C. in October 2007. Second Am. Compl. [12] ¶ 28. The specific purpose of the meaning was to "creat[e] the mechanisms by which Mr. Bryant, and through him, DDB, and Mr. Feigenbaum would do business with Plaintiff in Washington, D.C., and obtain access to the Archive from Plaintiff in Washington." *Id.* at ¶ 29. After the parties agreed that a "formal opinion would be obtained from a leading expert on legal ethics," Mr. Abeles formed FLG in November 2007 for the purpose of doing business with DDB and Mr. Feigenbaum. *Id.* at ¶ 31. Accordingly, after Mr. Abeles obtained two expert opinions concluding that the prospective fee-sharing agreement was legally permissible, DDB expressed that they were prepared to enter into the licensing agreements with plaintiff. *Id.* at ¶ 37.

Next, FLG, DDB, and Jonathan Feigenbaum entered into two separate agreements for the licensing of the Archive. *Id.* at ¶¶ 44-66. The first was the Strategic Alliance Co-Counsel Agreement ("SACCA"), providing "for the joint representation and prosecution of disability claims." *Id.* at ¶¶ 44-45. Under the terms of the agreement, DDB and Feigenbaum would separately gain access to the Archive when prosecuting insurance claims, and in return, FLG would serve as co-counsel. *Id.* The SACCA contained a somewhat complex fee splitting formula to divide the fees between either DDN or Feigenbaum and FLG. *Id.* at ¶¶ 48-49. It also provided for special fee calculations for class actions and marking to potential class action clients. *Id.* at ¶¶ 50-51. Lastly,

the parties agreed that each would be "subject to an audit" upon ten days prior written notice provided by "the Firm or Firm [sic] who are not first chair on the subject claims or litigation." *Id.* at ¶ 52 (citing SACCA ¶ 4(c)). Importantly, the contract was signed by defendant Bryant on behalf of "Daley, DeBofsky & Bryant," not "Daley, DeBofsky & Bryant, P.C." *Id.* at 56; *see also* Pl.'s Mem. [21] at 27.

In addition to SACCA, at the same time, the parties entered into the Fulcrum-Alliance Archive Sublicense Agreement ("FAASA"), which granted a sublicense to DDB to the Archive in connection with claims or litigation subject to the SACCA. Second Am. Compl. [12] ¶¶ 59-62. The agreement made clear that DDB did not have "any right to use any [documents] from the Archive except for claims or litigation subject to the [SACCA] and the fee sharing terms and conditions thereof." *Id.* at ¶ 63 (citing FAASA ¶ 2). Lastly, in signing FAASA, DDB also expressly agreed not to take any action that would tend to destroy or diminish the goodwill or value associated with the Archive. Similar to the SACCA, the FASSA was signed by defendant Bryant on behalf of "Daley, DeBofsky & Bryant," not "Daley, DeBofsky & Bryant, P.C." Pl.'s Mem. [21] at 27.

After signing these agreements and receiving access to the Archive, plaintiff alleges DDB used the Archive without compensating FLG according to the terms of its agreement. Second Am. Compl. [12] ¶ 70. Specifically, a lawsuit that DDB filed in Ohio settled in August 2011 for more than $1,000,000—none of which was remitted to FLG under the terms of SACCA and FAASA. *Id.* Defendant additionally points to several other cases in which "DDB also failed and refused to remit the amounts owed to Plaintiff under the fee allocation provisions of the SACCA." *Id.* at ¶¶ 71-72.

In connection with these alleged acts of deception, plaintiff brings nine separate causes of action—mostly relating to fraud and breach of contract—and seeks to hold the members of Daley,

4

DeBofsky & Bryant, P.C. personally liable. *Id.* at ¶¶ 73-83. Primarily, plaintiff argues that the defendants should bear personal liability because they "held themselves out as a partnership." *Id.* at ¶ 73. In addition to claims of fraud and breach of contract, plaintiffs also have brought claims for breach of implied covenant of good faith and fair dealing; a claim under the Business Corporation Act; a claim for fraudulent transfer; a claim for unjust enrichment; a claim for an audit under FAASA and SACCA; and a claim for injunctive relief to prohibit defendants' future use of the Archive. *Id.* at ¶¶ 99-123.

The procedural history of the case is somewhat complex. This lawsuit was originally filed on February 10, 2014 in District of Columbia Superior Court. On April 7, 2014, plaintiff filed an Amended Complaint, and defendants filed a notice of removal to the federal district court on October 1, 2014. Seven days later, on October 7, the defendants filed a motion to dismiss the Amended Complaint. In response, on November 3, plaintiff filed a Second Amended Complaint, and later that month, defendants filed a motion to dismiss that complaint pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6), one of the two motions currently before the Court. Additionally, plaintiff filed a Motion for Leave to Take Jurisdictional Discovery on November 3, 2014.

## II.     LEGAL STANDARD FOR FAILURE TO STATE A CLAIM

A motion to dismiss is appropriate when a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To overcome this hurdle, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). The Court must "accept as true all of the factual allegations contained in the complaint," *Atherton v. District of Columbia*, 567 F.3d 672, 681 (D.C. Cir. 2009), and grant a plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276

(D.C. Cir. 1994). However, the Court may not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Id.* In other words, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009); *see also Atherton*, 567 F.3d at 681.

## III.   DISCUSSION

The viability of several of plaintiff's claims depends on whether or not the defendants may be held personally liable for debts incurred by DDB, a professional corporation in which they were members. The legal standards governing this inquiry are found in D.C. Code § 29-603.08(a)(b) and the common law's approach to piercing the corporate veil.

A) D.C Code Section 29-603.08 (a)(b): Liability of a Purported Partner

Although plaintiff leans heavily on D.C. Code § 29-603.08(a)(b) to confer personal liability onto the defendants, its central legal theory is unpersuasive and ultimately untenable. D.C. Code § 29-603.08(a) provides that anyone who "purports to be a partner, or consents to being represented by another as a partner" shall be liable to any person who relies on that representation when entering into a transaction with the purported partnership. In other words, "when individuals act as a partnership, even if there is no partnership, they can be liable to one who entered into a transaction with the purported partnership." *Geier v. Conway, Homer & Chin-Caplan, P.C.,* 983 F. Supp. 2d 22, 35 n .7 (2013).

D.C. Code § 29-603.08 (a)-(b) draws directly and entirely from § 308 of the Uniform Partnership Act ("UPA"), revised and updated in 1997. *See* Uniform P'ship Act § 308 (1997) ("If a person, by words or conduct, purports to be a partner, or consents to being represented by another as a partner, in a partnership or with one or more persons not partners, the purported partner is liable to a person to whom the representation is made, if that person, relying on the representation, enters into a transaction with the actual or purported partnership."). Indeed, as designed, § 29-

6

603.08 (a)(b) is an exact carbon copy of UPA § 308 (the two provisions are identical but for § 29-603.08 (a)(b) swapping "shall be liable" in for UPA § 308's "is liable").

In terms of substance, § 308 "continued the basic principles of partnership by estoppel," as stated in the original 1914 version of the UPA and as historically articulated in common law. *See* Uniform P'ship Act § 308 (1997), cmt. To date, the 1997 version of the UPA, including § 308—at issue in this case—has been adopted in thirty-seven states, Illinois among them, and in the District of Columbia. *See* Uniform Law Comm'n, Acts: Partnership Act (1997) (last Amended 2013), http://www.uniformlaws.org/Act.aspx?title=Partnership Act (1997) (Last Amended 2013); *see also* 805 ILCS § 206/308(a)(b) (showing Illinois's adoption of UPA § 308).

To succeed on a theory of partnership by estoppel, a plaintiff must demonstrate three elements: (i) the defendant or defendants were held out as partners, (ii) the plaintiff relied on that representation, and (iii) that reliance was reasonable. *See infra* pp. 8-10. The first two elements are plain in the text of D.C. § 29-603.08 and discussed at length in each party's briefings. *See* Pl.'s Mem [21] at 24-26; Defs.' Mem. [19-1] at 18 (arguing that plaintiff fails to allege that it relied on defendants' representations); Defs.' Mem. [22] at 15-16 (same).

Considering the record before it and taking plaintiff's assertions as true at this stage in the litigation, the Court finds factual disputes exist with respect to partnership by estoppel's first two requirements. With respect to the first element, SACCA and FAASA's listing DDB as "Daley, DeBofsky & Bryant" not "Daley, DeBofsky & Bryant, P.C." at a minimum, creates a question of whether or not the firm was held out as a partnership as opposed to a professional corporation. Indeed, David Bryant signed the two separate agreements in such a fashion. *See* Pl.'s Mem [21] at 27; Second Am. Compl., Ex. I (showing SACCA); *id.* at Ex. H (showing FAASA). Moreover, the firm's letter head and its emails from personnel during negotiations with FLG and Abeles stated the name of the firm as "Daley, DeBofsky & Bryant" not "Daley, DeBofsky & Bryant, P.C."

7

Second Am. Compl. ¶ 79. And not to be discounted, the sign on the firm's wall in Chicago likewise omitted the letters "P.C.," reading simply "Daley, DeBofsky & Bryant." *Id.* at ¶¶ 76, 77.

Next, looking to the issue of plaintiff's reliance on defendants' representations, the Court also finds that factual disputes exist, preventing dismissal at this early stage of litigation. Abeles has signed a declaration stating, "Had I been aware that the DDB law firm was a 'corporation,' I would have conferred with Mr. McGinty about the proper protections for Fulcrum and Equitas, and I would have demanded personal guarantees in each of the relevant agreements to assure all obligations and debts arising from the SACCA were in addition the commitments made by Daley, DeBofsky and Bryant." Defs.' Mem., [21], Ex. A, Abeles Decl. ¶ 24. Although defendants argue that "[p]laintiff has not alleged that it relied on Defendants' alleged partnership status," Defs.' Mem. [22] at 16, the Court finds this signed declaration creates a factual dispute.

After analyzing the first two prongs of plaintiff's partnership by estoppel theory, the Court finds that Abeles's reliance—if it in fact existed—was unreasonable, thus stripping plaintiff's theory of any and all merit. Although case law in our jurisdiction is sparse, official comments by the National Conference of Commissioners on Uniform State Laws and rulings from courts around the country make explicit that in order to prevail on a partnership by estoppel claim, plaintiffs must show their reliance on defendants' representations was reasonable. First, the official comments of UPA § 308 state the provisions are designed to "continue the basic principles of partnership by estoppel." *See* Uniform P'ship Act § 308 (1997), cmt. These basic principles include a showing that plaintiff's reliance was reasonable, requiring a reasonable inquiry if the purported partners' representations are ambiguous. *See* James Buchwalter et al., Corpus Juris Secundum: Partnership, 68 C.J.S. Partnership § 53 (2015) ("A party's reliance must be made in the exercise of reasonable prudence and good faith. . . . The parties have an obligation to inquire into the nature of an agreement which is ambiguous as to the existence of a partnership."); J. William Callison &

Maureen A. Sullivan, Partnership Law & Practice § 5:28 (2014) ("[T]he reliance must be reasonable."); *see also Branscome v. Schoneweis*, 361 F.2d 717 (7th Cir. 1966) (applying Illinois law and specifically finding "[t]he District Court found that the plaintiffs exercised due diligence, and in their dealings after March, 1961, relied in good faith, to their detriment, on [defendant's] representation that he was a partner").

More recently, courts have interpreted language similar or identical to D.C. Code § 29-603.08(a)(b) to reaffirm that the "partnership-by-estoppel doctrine conditions liability on the plaintiff having reasonably relied on the representation of partnership, which often involves an exercise of due diligence to ascertain facts." *In re Cay Clubs*, 130 Nev. Adv. Op. No. 14, at 14 (Nev. 2014). Indeed, this "prerequisite" for reasonableness exists even though it is not "explicitly stated" in the texts of the relevant statutes. *Id.*; *see also Cheesecake Factory, Inc. v. Baines*, 125 N.M. 622, 630 (N.M. Ct. App. 1998) (describing New Mexico's reasonableness requirement); Uniform P'ship Act Ann. (last Amended 2013), § 308, cmt. (West 2015) ("Even though [subsections (a) and (b) of § 308] refer to 'reliance' without expressly imposing a reasonableness requirement, the requirement exists in case law."). This legal interpretation should come as no surprise given that the revised 1997 UPA "continues the basic principles of partnership by estoppel," Uniform P'ship Act § 308 (1997) cmt., which has traditionally held that plaintiff's belief in the existence of a partnership must be reasonable. *See Bragg v. Johnson*, 229 A.2d 497, 498 (Del. Super. Ct. 1966) ("The query is, then, whether plaintiffs had a reasonable right to believe, under all the facts and circumstances, that [defendant] was a partner"); *Gamble Robinson Co. v. Carousel Props.*, 688 P.2d 283, 288 (Mont. 1984) ("This reliance must be reasonable, and under the circumstances, the third party is 'under a duty to make a reasonable inquiry to ascertain whether he was dealing with an individual or a corporation' (quoting *Payne v. Lucas*, 517 S.W.2d 602, 607 (Tex. Civ. App. 1979))); *Wis. Tel. Co. v. Lehmann*, 80 N.W.2d 267, 270 (Wis. 1957) ("The party

seeking to hold him liable as a partner must, in the exercise of reasonable prudence and good faith, have relied upon such condition or thing and been misled by it" (internal quotations omitted)).

Applying this standard, plaintiff has asserted absolutely no facts to show its reliance was reasonable or that it performed even the most casual or cursory inquiry into DDB's legal status. Abeles had literally hundreds of opportunities to confirm his understanding, and he appreciated the strong incentives for doing so—making his failure completely and clearly unreasonable. Reflecting the extensive nature of the negotiations, over 500 emails were exchanged between Abeles, his lawyer McGinty, and DDB from the summer of 2007 through 2008. Defs.' Mem. [19-1], Ex. A, Bryant Decl. ¶ 19. During this period, plaintiff and defendants also organized nine separate in-person meetings across the country in an effort to build relationships with national class action firms. *Id.* at ¶ 22.

And not only did Abeles have ample opportunity to inquire as to DDB's legal status, he had good reason to do so. Abeles considered the Archive to be incredibly valuable and was understandably highly protective of it, requiring defendants to sign non-disclosure agreements before negotiations even began. Second Am. Compl. at ¶ 11 ("Through his decades of working in the disability insurance industry . . . Mr. Abeles complied, analyzed, and organized more than 100,000 pages of documents."); *id.* ("Mr. Abeles had unique access . . . [and] developed a distinctive in-depth technical understanding of disability insurance policies and their correct interpretation."); *id.* at ¶ 13 ("[T]his valuable compilation of documents . . . materially enhanced the positions [of claimants and] their lawyers."); *id.* at ¶ 15 (concerning the non-disclosure agreement). Moreover, Abeles had never licensed the Archive before executing the SACCA and FAASA, resulting in the "inevitable loss" of good will, *id.* at ¶ 64 (citing FAASA, ¶ 5), and providing even more reason for plaintiff inquire about or at the very least confirm the DDB's legal status.

10

Lastly and importantly, Abeles "owned and operated more than a dozen business over the last 40 years," making him "well aware of the distinctions between and purposes for choosing the respective liability of the partners and/or shareholders thereof." Pl.'s Mem. [21], Ex. A, Abeles Decl. ¶ 23. These findings make clear that plaintiff had significant opportunities, strong incentives, and the baseline legal understanding to confirm his understanding that DDB was a partnership. The Court considers its failure to do so unreasonable, consequently invalidating plaintiff's theory of partnership by estoppel.

To be clear, plaintiff alleges sufficient facts to show the individual defendants may have held themselves out as partners, but their legal status at the very least remained ambiguous—giving rise to plaintiff's obligation to perform minimal due diligence. Aside from referring to each other as "partners," a term commonly used to describe senior attorneys in a law firm regardless of its structure, no one at DDB ever represented that the firm was not a professional corporation. Defs.' Mem., [19-2], Ex. A, Bryant Decl. ¶ 28; *id.* at Ex. G, Rose Decl. ¶¶ 12-13. Moreover, in 2009, upon receiving a payment from DDB, FLG signed and sent a notice of release to "Daley, DeBofsky & Bryant P.C." *Id.* at Ex. A, Bryant Decl. ¶ 29. Similarly, in 2013, when plaintiff demanded an arbitration proceeding against DDB, it identified "Daley, DeBofsky & Bryant P.C." as its counter-party in SACCA and FAASA. *Id.* at ¶ 30. And not to be overlooked, Joshua Rose, one of two co-founders of Equitas and a lawyer involved in the negotiations and execution of the two contracts at issue, understood DDB was a professional corporation and attested to the fact that Abeles never took any action at all to confirm or deny DDB's status. Defs.' Mem. [19-2], Ex. G, Rose Decl. ¶¶ 11-15. Although plaintiff disputes the importance of Rose's role in the negotiations, plaintiff cannot escape the fact "Daley, DeBofsky & Bryant P.C." was registered as a professional corporation in 2002—fully five years before it began negotiations for access to the Archive. Defs.' Mem. [19-2], Ex. G. By failing to assert a single fact showing that plaintiff inquired about or

confirmed DDB's ambiguous legal status—even in a casual or offhanded way—the Court finds plaintiff's alleged reliance unreasonable, thus disposing of its partnership by estoppel theory.

B) Piercing the Corporate Veil

In addition to partnership by estoppel, plaintiff could potentially hold defendants personally liable for DDB's debts by piercing the corporate veil. Once again, however, plaintiff fails to provide a single fact to support such a claim. In order to pierce the corporate veil under District of Columbia law, the plaintiff must show both that there is unity of interest between the owner and the corporate entity and that the owners "used the corporate form to perpetuate fraud or wrong." *See, e.g.*, *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 470 (D.C. 2008). In examining such a claim, courts looks to the following factors: (1) whether corporate formalities have been disregarded, (2) whether corporate funds and assets have been extensively intermingled with personal assets, (3) inadequate initial capitalization, and (4) fraudulent use of the corporation to protect personal business from the claims of creditors. *Id.* at 471; *Bingham v. Goldberg, Marchesano, Kohlman, Inc.*, 637 A.2d 81, 93 (D.C. 1994); *Vuitch v. Furr*, 482 A.2d 811, 816 (D.C. 1984).

In its efforts to hold the defendants individually liable for the debts of DDB, plaintiff invokes corporate veil piercing by claiming Bryant operated as DDB's "alter ego," Second Am. Compl. [12] ¶ 98, but alleges absolutely no facts responsive to the legal inquiry and provides no case law or authority to support its claim. Plaintiff makes no specific allegations that corporate formalities at DDB were disregarded, that funds were commingled, or that DDB was undercapitalized—indeed, DDB existed for eleven years in total and for six years after entering into FASSA and SACCA. The Court therefore has no choice but to disregard plaintiff's contention that piercing the corporate veil is appropriate in this case.

12

C)  Claim 1: Fraud

Because plaintiff did not "state with particularity the circumstances constituting fraud," Fed. R. Civ. 9(b), the Court finds that it has failed to properly state a claim and must therefore dismiss plaintiff's first cause of action. Under Washington D.C. law, the elements of a fraud claim are: (i) a false representation; (ii) in reference to a material fact; (iii) made with knowledge of its falsity; (iv) with the intent to deceive; and (v) the action was taken with reliance on the representation. *Wash. Inv. Partners of Del., LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 580 (D.C. 2011) (citing *Bennit v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977)); *Drake v. McNair*, 993 A.2d 607, 662 (D.C. 2010).

Plaintiff alleges defendants' fraudulent scheme can be broken down into two categories. Pl.'s Mem. [21] at 30. The first is the representations defendants made to Abeles to induce him to acquire an ethics opinion and form FLG. *Id.* The second is the fraudulent conveyance of DDB's assets to avoid the firm's and partners' obligations to pay plaintiff, which is discussed more fully in subsection F of this memorandum opinion. *Id.* To highlight its "specific allegations" of fraud, plaintiff directs the Court to paragraphs 24 -31 and 70-72 of its Second Amended Complaint. *Id.* In referring to paragraphs 24-31, plaintiff begins the argument that it pled its fraud claim with "ample specificity" by asserting that Abeles obtained an expert opinion on fee splitting and formed FLG only after DDB and the individual defendants encouraged him to do so. *See id.*; Second Am. Compl. ¶¶ 24-31. Paragraph 31 then states, "Based upon the representation by Bryant, on behalf of himself and his partners at DDB, FLG was formed in November 2007, at significant expense to the Plaintiff. The subsequent conduct of the defendants, however, makes it plainly apparent that they never had any intention of entering into a contract that they considered binding." In paragraphs 70-72, plaintiff concludes its fraud argument by detailing the various ways in which DDB breached its contracts with FLG. *See id.* at ¶ 70 ("Defendants utilized the Archive for their

benefit, without compensating Plaintiff as required by the Agreements."); *id.* at ¶ 71 ("Similarly, Defendants have deliberately concealed their involvement in cases covered by the Agreements."); *id.* at 72 ("Defendants Bryant and DDB also failed and refused to remit the amounts owed to Plaintiff under the fee allocation provisions of the SACCA.").

Plaintiff argues that their fraud claim is separate from their breach of contract claim because defendants took steps to induce plaintiff—at plaintiff's expense—to ensure that the fee splitting agreement central to their prospective contract was legally permissible. But plaintiff's own allegations fall short of meeting the five elements for fraud, specifically that defendants made a false representation. According to plaintiff, the defendants represented that if Abeles formed a Washington-based law firm and obtained an expert letter, then DDB would enter into contracts to gain access to the Archive. Once the ethics opinions were received, DDB entered into the SACCA and FAASA, just as it had promised. Therefore, by plaintiff's own account, defendants' representations were not in fact false.

Plaintiff asserts that the defendants "never had any intention of entering into a contract that they considered binding," *id.* at ¶ 31, and defendants "never had any intention of entering into a contract that they considered binding," *id.* at ¶ 32, but those are the exact sorts of conclusory allegations of fraud that lack the necessary specificity to overcome a 12(b)(6) motion. *See, e.g.*, *Sarete, Inc. v. 1344 U Street Ltd. P'ship*, 871 A.2d 480, 494 (D.C. 2005) (reversing the trial court's finding of fraud and holding that "a misrepresentation is an assertion that is not in accord with the facts" (internal quotation omitted)); *Hickey v. Scott*, 738 F. Supp. 2d 55, 69 (D.D.C. 2010) (finding that defendant's refusal to pay for services plaintiff performed under a contract was not a misrepresentation of fact). Simply asserting that the defendants (i) encouraged plaintiff to enter into contracts, (ii) insisted that plaintiff ensure the legality of the contracts, and (iii) then ultimately breached those contracts does not meet Rule 9(c)'s requirement that all elements of the fraud are

alleged with specificity. As a result, plaintiffs have failed to plead sufficient facts to state a fraud claim against defendants, leaving the Court no choice but to dismiss plaintiff's first count under Rule 12(b)(6).

### D) Claims 2 and 3: Breach of Contract and Implied Covenant of Good Faith and Fair Dealing

As previously discussed, the complaint fails to state claims of breach of contract or breach of implied covenant of good faith and fair dealing against the individual defendants because the defendants in this case were not parties to the underlying contracts. Indeed, the relevant contracts were entered into by DDB, an Illinois limited liability professional corporation founded in 2002. It is true that the firm listed on SACCA and FAASA was "Daley, DeBofsky & Bryant"; however, typically, a small variation in the corporation's actual name and the way in which its name is presented on a legal instrument is not enough to confer individual liability on the signatory or the corporation's owners. *See* Fletcher Cyclopedia of the Law of Corporations, Name and Identity of Corporation, § 4591 (2015) ("A variance between the name of the corporation as it appears on an instrument and evidence is not material if the identity of the corporation is reasonably clear."). The Court finds that in this case, it is reasonably clear that "Daley, DeBofsky & Bryant" referred to "Daley, DeBofsky & Bryant P.C.," a professional corporation registered in Illinois in 2002. Supporting that conclusion, as mentioned, when FLG contacted DDB with a notice of release in 2009 and when Equitas sent the firm a demand for an arbitration proceeding in 2013, the letters were addressed to "Daley, DeBofsky & Bryant, P.C.," and not to "Daley, DeBofsky & Bryant." Defs.' Mem., [19-2], Ex. A, Bryant Decl., ¶¶ 29, 30.

Additionally, the parties cannot be held liable for DDB's alleged breach of contract or the implied contractual duties of good faith and fair dealing under theories of partnership by estoppel or piercing of the corporate veil. DDB was the counterparty, and DDB is the only party for which

these claims may be properly alleged. Not surprisingly, an arbitrator came to the same conclusion, finding "[n]one of Messr.s Daley, DeBofsky, and Bryant was a party to either of the two contracts on which Claimants base their claim, nor does their potential liability for pro rata shares of corporate assets that may have been distributed to them upon dissolution of Daley DeBofsky & Bryant PC render them 'successors' under the SACCA." *See* Defs.' Mem [19-1], Ex. A-3.

E) Claim 4: Violation of the Business Corporation Act

Plaintiff has ignored the argument defendants put forth in support of their motion to dismiss plaintiff's claim under the Business Corporation Act. Defs.' Mem. [22] at 21-22. By doing so, plaintiff has effectively conceded the argument. *See Rosenblatt v. Fenty*, 734 F. Supp. 2d 21, 22 (D.D.C. 2010) ("An argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded."). In its complaint, plaintiff alleges that DDB failed to notify plaintiff of its dissolution as required by 805 ILCS 5/12.75 and D.C. Code §§ 29-312.06 and 29-504. Second Am. Compl. ¶ 105. In response, defendants argue that any liability under the Business Corporation Act is limited to those losses or damages that arise from defendants' failure to provide notice of the dissolution. According to defendants, because "[p]laintiff alleged no loss or damage resulting from DDB's alleged failure to notify plaintiff of is dissolution," its claim must be dismissed under § 12(b)(6). Defs.' Mem. [19] at 40. In its response memorandum [21], plaintiff makes no mention of the defendants' arguments and completely omits any discussion of the Business Corporation Act, properly conceding the claim and resulting in its dismissal.

F) Claim 5: Fraudulent Transfer Act

Similar to the claim of fraud, with respect to its claim of fraudulent transfer, plaintiff fails to allege with specificity the facts necessary to meet the heightened pleading requirements of Rule 9(b). This heightened pleading standard applies to causes of action involving fraud, such as those brought under the Fraudulent Transfer Act, and requires "the circumstances constituting fraud or

mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The pleading standard requires that the plaintiffs assert in their complaint the "who, what, when, where, and how of the fraud." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012); *Gen. Elec. Capital Corp v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir. 1997).

With respect to the Fraudulent Transfer Act, codified at 740 ILSC § 160/5, plaintiff once again fails to meet this heightened standard. Plaintiff first asserts "The recipients of the transferred assets of DDB were almost certainty Daley, DeBofsky and Bryant themselves." Pl.'s Mem. [21] at 35. Next, Equitas claims:

> It is impossible without discovery for Plaintiff to know the value of all the assets transferred as a result of the dissolution of DDB, but it is entirely reasonable at this stage to assume that the bulk of the assets of the practice were cash, whose value remains relatively constant. . . . Although the Plaintiff cannot know without discovery whether assets were transferred to a lienor before being transferred to an 'insider,' it is reasonably clear that the assets were distributed in large part to Daley, DeBofsky and/or Bryant individually. *Id.* at 36.

In the Court's view, the only concrete assertion plaintiff makes is that DDB was dissolved in June 2013. Aside from that, everything else is asserted on "information and belief." Second Am. Compl. ¶ 110. Plaintiff makes no attempt to describe the "the time, place, and content" of the alleged fraud—something the courts have held plaintiffs "at a minimum" must do to meet Rule 9(b)'s standard. *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001). The plaintiff simply makes conclusory allegations and unsupported assumptions about DDB's financial situation and related transactions, falling well short of the heightened pleading requirement. The Court will therefore dismiss plaintiff's claim under the Fraudulent Transfer Act.

G) Claim 6: Unjust enrichment

Like the claims before it, plaintiff fails to allege the facts necessary to support its claim of unjust enrichment against the individual defendants. To state a claim for unjust enrichment, plaintiff must allege: (i) the plaintiff conferred a benefit upon the defendant; (ii) the defendant

17

accepted and retained the benefit; and (iii) it would be unjust for the defendant to retain the benefit under the circumstances. *See Euclid St., LLC v. D.C. Water & Sewer Auth.*, 41 A.3d 453, 463 n. 10 (D.C. 2012); *McIntosh v. Gilley*, 753 F. Supp. 2d 46, 60 (D.D.C. 2010). Although plaintiff cites to two cases to support its claim, neither stands for the notion that unjust enrichment can be used as a backdoor to effectively pierce the corporate veil and hold individuals liable for actions taken by a corporation they own or are associated with.

Indeed, plaintiff cites to *News World Communications, Inc. v. Thompsen*, 878 A.2d 1218 (D.C. 2005), to support its alternative argument that even if defendants were not parties to FAASA and SACCA, they should be held individually liable for benefits DDB received under a theory of unjust enrichment. But *Thompsen* centers on the concept of quasi-contracts—the idea that a defendant may be held liable under an unjust enrichment theory even though defendant did not enter into a legally binding agreement—and has nothing to do with shareholder or member liability.

The facts of *Thompsen* provide an illustrative example of a standard quasi-contract claim and map on directly to the three elements of unjust enrichment discussed above. In *Thompsen*, the plaintiff alleged that she had met with executives at News World Communications to discuss her idea for a weekly supplemental magazine she called "Family Times." *Id.* at 1220. After first expressing enthusiasm for the idea, the executives told the plaintiff that her proposal was not novel and she would not be compensated. Two years later, News World Communications published its first edition of "Family Times," satisfying the three elements of unjust enrichment and properly giving rise to the plaintiff's claim. The Court in *Thompsen* then cites to a number of similar cases that summarize the "essence of the doctrine as follows: . . . defendant was unjustly enriched at [plaintiff's] expense and that the circumstances were such that in good conscience [the defendant] should make restitution." *Id.* at 1222 (quoting *Vereen v. Clayborne*, 623 A.2d 1190, 1193-94 (D.C.

1993). In summarizing these cases, the Court makes no mention of the theory plaintiff currently puts forth.

Not only is plaintiff's central theory an awkward fit the cases plaintiff cites to, but other D.C. courts have agreed the theory of unjust enrichment should not be expanded to serve as a roundabout way of disregarding the principles of limited liability. *See U.S.* ex rel *Purcell v. MWI Corp.*, 520 F. Supp. 2d 158, 173 (D.D.C. 2007) ("Here, the defendant is a stockholder of a corporation that received a benefit from the plaintiff. The plaintiff may only rely on an inference that a stockholder by means of his corporate equity received a benefit if the plaintiff shows that the stockholder abused the corporate form, using it as his own alter ego to perpetrate fraud—in which case, the corporate veil should be pierced. . . . In this case, any benefit was conferred on the corporation and not the individual defendant." (citing *Metalmeccanica Del Tiberina v. Kelleher*, No. 04-2567, 2005 WL 2901894, at \*4 (4th Cir. Nov. 4, 2005) (rejecting a similar unjust enrichment claim where the benefit was ruled to have been received by the corporation and not the corporation's owners))).

In this case, plaintiff alleges no facts to show that the individual defendants entered into quasi-contracts with the plaintiff. Any benefit that the individual owners received from access to the Archive was derived from their ownership interest in DDB. Indeed, the facts of this case are entirely dissimilar from those of *Thomspen* and others that articulate the purpose and boundaries of unjust enrichment claims. Because plaintiff provides no cases or legal authority to support its unduly expansive theory of unjust enrichment, the Court will dismiss plaintiff's sixth count for failure to state a claim.

H) Claim 7: An audit

Under § 15 of the FAASA and § 4(c) of the SACCA, plaintiff is entitled to request an audit, and in its complaint, seeks to enforce those provisions. Similar to other contractual rights plaintiff

seeks to vindicate, however, the claim for an audit must also be dismissed against the defendants in their personal capacities because the claim arises out of the rights and obligations under agreements in which they were not party to. Plaintiff concedes this point, stating the audit claim is "a count for breach of Contract, and requests specific performance under those contracts." Defs.'s Mem. [21] at 37. Because the individual defendants are not parties to the agreements, the claim for an audit under the FAASA and SACCA will be dismissed.

   I)   Claim 8: Injunctive Relief

   Lastly, plaintiff's complaint alleged an eighth and final cause of action—a claim for injunctive relief against all defendants. Plaintiff alleges that injunctive relief is appropriate in light of the serious nature of defendants' breaches of SACCA and FAASA. Second Am. Compl. ¶¶ 121, 123. Unfortunately, once the first seven causes of actions have been dismissed, the claim for injunctive relief must also be dismissed as injunctive relief is a type of remedy, not a freestanding cause of action. *See Base One Techs., Inc. v. Ali*, 78 F. Supp. 3d 186, 199 (D.D.C. 2015); *Johnson v. District of Columbia*, 49 F. Supp. 3d 115, 117 n. 1 (D.D.C. 2014); *Guttenberg v. Emery*, 41 F. Supp. 3d 61, 70 & n. 5 (D.D.C. 2014).

   To support its argument, defendants specifically invoked *Guttenberg*'s ruling that "Count II [injunctive relief] of plaintiffs' amended complaint is not a separate cause of action or claim; rather it is an request that the Court grant a particular form of relief (an injunction) to redress that other claims plaintiffs assert. For that reason, the Court will dismiss Count II for failure to state a claim." Defs'. Mem [19-1], at 42. Tellingly, plaintiff makes no effort to rebut this argument. This Court reaches the same conclusion as those before it; because a preliminary injunction is not a freestanding cause of action, the Court will dismiss plaintiff's eight and final count for failure to state a claim.

## IV.   PLAINTIFF'S MOTION [15] FOR LEAVE TO TAKE JURISDICTIONAL DISCOVERY

As discussed, the Court will grant defendants' motion and dismiss plaintiff's second amended complaint in its entirety for failure to state a claim. Consequently, the Court will also dismiss plaintiff's motion for leave to take jurisdictional discovery.

## V.   CONCLUSION

For the reasons stated above, the Court will GRANT defendants' Motion [19] to Dismiss the Second Amended Complaint and DENY plaintiff's Motion [15] for Leave to Take Jurisdictional Discovery.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth on September 29, 2015.

Judge Royce C. Lamberth